We'll proceed now with Montanez v. Price, 23-2699. Ms. Novak. Good morning, Your Honors, and may it please the Court. Lillian Novak for Appellant Jose Montanez. I'd like to reserve four minutes for rebuttal. So he pronounces it Montanez? Montanez, yes. Thank you, Your Honor. So Mr. Montanez in this case pleads two separate claims against distinct classes of defendants. So for his ADA and Rehabilitation Act claims for the failure to accommodate his disability, he correctly and sufficiently proceeds against the state of Pennsylvania. For his Eighth Amendment claims for deliberate indifference to his serious medical needs, he correctly proceeds against individual defendants. There are six individual defendants. Two of them, Dr. Mollie and Nurse Wagnon, interacted with Mr. Montanez during the period of time when he first became paralyzed. The remaining four, Drs. Preston and Edwards, P.A. Nally, and Mr. Ehlers, interacted with him after he received surgery and was returned to the prison system. The District Court, in dismissing both of these claims on the merits, makes several distinct legal errors, many of which the appellees in this case do not even attempt to defend in their race to this court. The edges of this case butt up against some unsettled doctrines about liability that this court asked us to address in their most recent letter to counsel, and I'm very happy to talk about all of those. Before you do, as to the other defendants? Yes. Like Bullock, Price, Wakefield, Ravello, Patton, Davis. Do you concede that your client failed to state a claim as to them? Yes, so they're not, so some of those defendants, he alleges, actions that go to the liability of the states under the ADA, but we do, we're not pressing any Eighth Amendment claims against those individuals in there. But should he be able to, to amend if there's anything to add against them? Yes, if there's anything to add against. If he has additional information, the six that I outlined, we believe he has stated a claim in the current complaint, and that for some of them, if it doesn't quite rise to the level of stating a claim, he's certainly alleged enough facts in the opposition, although not properly included in opposition, such that remand and amendment would not be futile. So as I was saying, this court put some questions to us, and I'm more than happy to talk about those, but the majority of the questions in this case, but this court can resolve this appeal without resolving the majority of those questions, looking just at how liability runs against those defendants that I pointed out at the start. And this court can reverse on three legal errors and remand for further proceeding and amendment. And those legal errors are first looking at the Rehabilitation Act claims. The district court held that Mr. Montanez did not state that he lacked meaningful access to any prison programs or services. In his complaint, he alleges that there are many prison programs and services that both during this initial time period of his paralysis and later when he was going through his slow and halting recovery, he didn't have access to. In the complaint, those include toileting, bedding, the medical department, and mobility. And all of those, looking at the Supreme Court's decisions in Yeski and Georgia, and this court's decision in Fergus that held that a shower was a program or service within a prison, are sufficient allegations. You have good authority as to those, but when it comes to bedding, to double mattress, we've got the Seventh Circuit Bryant decision. And where is the distinction? Where would we be drawing the line between what constitutes program or service versus medical treatment when it comes to something like a request for mattress? Yes, Your Honor. So this court has adopted Bryant v. Madigan, my apologies, so far just an unpublished decision, ICELI. And this court actually doesn't have to resolve that question to resolve this appeal because Mr. Montanez's case was dismissed on the pleadings, and all he has to do is allege lack of access to, failure to accommodate for lack of access to one program. And he alleges several. So even if this court doesn't rule on bedding, you all can rule on the others. But to address your question, I think it helps to take a step back and look at what the purpose of the ADA is, which is to ensure access for people with disabilities on par with access for people who are not disabled. And so getting a double mattress could be medical treatment for someone who, you know, perhaps, and this isn't Mr. Montanez's situation necessarily, but perhaps who had a condition that having, I'll actually recede on that a bit. I was trying to do a counterfactual, but I'm not entirely sure that it holds. I think the question is, can he actually get a good night's sleep? Can he get a good night's sleep on par with someone else? And if he can't get that with the mattress, it's an accommodation. It's not something that's treating his underlying medical condition. So I think that's the question the court wants to hone in on. But again, the Bryant versus Madigan question does not need to be resolved to resolve this appeal. Can you talk about, I'm curious to know, is WellPath a public entity under Title II of the ADA? So we're not pursuing that argument. I think that that's an unsubtle question in this circuit, but the weight of authority is against the idea that it's a public entity. Are WellPath doctors engaged in state action under 1983? Yes. So I think that the Supreme Court's decision in West answers that question. So that was a contract doctor that because he was performing a traditionally essentially government, exclusively governmental function, was found to be acting under color of law. Okay. If the doctors denied him access to a prison service program or activity, who's liable for that? The Commonwealth or WellPath or the individual doctors? So our position is the state would be liable for that. So this goes to the fourth question that the court put to us in its letter to the parties. So the state can't contract away its liability for non-discrimination against disabled people by contracting away its interactions with disabled people. This is again- What about WellPath on its own? WellPath's liability. So WellPath under the ADA as not a public entity wouldn't have its own liability as an entity. Under Section 504 of the Rehabilitation Act, it's a slightly more complicated question. It would be whether they receive federal funding themselves. Mr. Montanez didn't allege that in this necessarily truncated complaint, but there is public record of WellPath having federal contracts. Do they actually have federal contracts for that to qualify as funding under the Rehabilitation Act? If they're receiving federal funds, yes. If your question is to at what level, like whether they have a contract somewhere else versus funding for their work at the Pennsylvania Department of Corrections, I think that that is an open and more complicated question. This court has considered it with respect to if a state agency gets funding, then all parts of the state agency are bound by the Rehabilitation Act, not just the part that the funding gets funneled to. That's a question we'd more than happy to provide supplemental briefing on and more thinking on, but it isn't one that needs to be resolved to resolve this appeal because Mr. Montanez actually hasn't alleged that WellPath itself receives federal funding. He alleges that the state did, and he can proceed against the state on the Rehabilitation Act, and he alleges that the Pennsylvania Department of Corrections has, and proceed against them. But that would be something that he could allege on remand in an amended complaint, and that would come before the district court. These doctors, not the ones at the prison, but the ones working for WellPath, the private individuals, do they have an official capacity? It seems a little odd to sue a private doctor in an official capacity. So should we just view that category as just not fitting this context? So I think that it, I think it's, yeah, it's really, it is confusing. I agree with you, and I think that it, under the ADA, their actions are imputed to their employer in the state ultimately for liability. For the, I'm sorry, for the Eighth Amendment, they're being sued in their individual capacity for damages. So the question would be their official capacity for injunctive claims. I think that because they're performing this traditionally exclusive governmental function, there's, it would be strange to hold that there was no way for a plaintiff to get an injunctive remedy against them. But that's also not something that this court needs to resolve at this stage, because as defendants point out, Mr. Montanez has been transferred to a different prison, so none of the individual medical providers that he is suing are the ones who are currently providing him care, so he wouldn't have any injunctive claim against them. I see. So that remedy is moot as to those individual doctors. Exactly. So damages remains alive, and injunctive relief against the Commonwealth remains alive. Exactly. Now, Smithfield, or where is he now? He's at SCI Benner, which is not, Benner, not one of the three prisons covered in the complaint. Okay. So if I could speak a little about the second error under the ADA that the district court made. It's about deliberate indifference. So because Mr. Montanez seeks damages under the Rehabilitation Act and the ADA, he must show deliberate indifference. And this court explained in its opinion in Durham that the standards for deliberate indifference under the ADA and under the Eighth Amendment are distinct, and that the ADA standard is higher. And the district ordinance analysis said, well, we found no deliberate indifference for the Eighth Amendment, so there's none for the ADA. But failure to meet a higher standard cannot mean failure to meet a lower standard. And Mr. Montanez did, in fact, meet the lower ADA deliberate indifference standard, which is that the state of Pennsylvania, the Pennsylvania Department of Corrections, acted with a knowing disregard towards a substantially likely violation of his federal rights, and those are his disability rights. And so we have that alleged in both the conduct of state employees like Nurse Wagman, who took him to the brink of his cell in a wheelchair and saw he was in this inaccessible cell that made him drag his body across the floor, as well as Mr. Montanez alleges that he grieved everything up to the top of the grievance process. So there was knowledge alleged throughout the grievance process of the prison system. I'd like to talk a little bit about the Eighth Amendment liability as well, and why Mr. Montanez has sufficiently alleged deliberate indifference. So for Nurse Wagman, this question is resolved by this court's decision in Pearson. That was a case in which a nurse made a man who was excruciating pain crawl across a cell to get to a wheelchair. And this court held that that conduct was exactly the kind of not medically informed, wanton behavior that the Eighth Amendment is meant to prescribe. And it's important in that case, the court really focuses on that one moment, that one decision that the nurse made to make this plaintiff who was in excruciating pain crawl across the floor. Nurse Wagman did the same thing. She took Mr. Montanez to the edge of his cell and had him drag his body, not only in excruciating pain, but he was in fact paralyzed with a spinal injury, that there was a great risk of further harm to himself by making him move in this manner. And that's sufficient to answer the question for Nurse Wagman. Turning to Dr. Molley. So Dr. Molley came to Mr. Montanez's cell the next day. And he never took him to the medical unit to examine him. He examined him, or he purports to have examined him. We would argue that he actually didn't conduct an examination through the bars of his cell. And this is actually the same conduct as one of the defendants in this decision in Sproul v. Gillis, where the doctor came to the cell. The plaintiff in that case actually had the same disability, the same underlying serious medical needs, spinal stenosis, as Mr. Montanez. And the doctor in that case went to the cell and said, you're not going to the medical unit. I hear you're in a lot of pain. That plaintiff actually wasn't paralyzed. He was just in a lot of pain. I also see that I've gone into my rebuttal time. You're on our time. Okay. We'll keep track just by adding, let's say, 10 minutes. Okay. Thank you so much. So in that case, the plaintiff was not, in fact, paralyzed, but was in excruciating pain from the same underlying serious medical need. And the court held that two medical providers, both that doctor and a physician's assistant, were deliberately indifferent because of their failure to provide medical care to that plaintiff when that failure to provide care was likely to lead to undue suffering and to a risk of residual tangible injury. What about Dr. Preston, where the denial of medication seems like the only allegation that we have? Yeah. So I think for Dr. Preston, it's important to look at it in the full context. So medication or one medication or another would come to where near to rising to the level of deliberate indifference and stating an Eighth Amendment claim. But Dr. Preston's actions happened when Mr. Montanez had had major spinal surgery just about two weeks earlier, still could not walk, still could not stand by himself. And that denial of care put him in a position, as he in the additional facts included in his opposition, where he fell many, many times trying to move through this excruciating pain about the cell that he was in trying to access the toilet. And he actually did fall and suffered another spinal injury, a herniated disc. And so how do you distinguish that from, say, medical malpractice? So I think that the distinguishing factor is that that denial of care, that providing any level of medical care doesn't immediately defeat deliberate indifference, because the medical care can be at a level where it still creates such an undue risk of suffering and this risk of creates undue suffering and a risk of further injury. So I think Spruill is helpful here. Again, the PA that the court, the physician's assistant that the court found to be deliberately indifferent in that case, the action that he took was telling Mr. Spruill, who had the same condition as Mr. Montanez, I'm not going to give you, I hear you're in pain, I'm not going to give you different pain meds. I'm not going to change your medication. And it's because of this context. It's because of the undue risk for someone who's in pain with this sort of mobility impairment that that adheres. Again, if this court doesn't find the allegations against Dr. Preston and the short complaint sufficient, which they're conceivably sparse, there is a lot more information that Mr. Montanez includes that he should be able to amend in that would certainly not be futile. That was excellent. My question is, are there other information you could put into an amended complaint? Yes. So there is, Mr. Montanez also goes to Dr. Preston and says that he had asked a nurse at the facility. Some of this goes also to his disability claims, but on the Eighth Amendment claim, I think it suffices to help with this undue suffering element of the deliberate indifference test. So when he was first transferred to the first prison he was at after he was in the center, he pressed a button, he alleges all of this in the amendment, asking a nurse to help him get to the toilet. And she said, I'm not going to help you. That's only for emergencies. You just have to do the best yourself. And he brought that to Dr. Preston as well and said, I keep falling trying to use the toilet in my cell because I have to boost myself into my wheelchair. And Dr. Preston also says, you're just going to have to try to do the best on your own with no attempt to insulate him from further harm. And that could have been something that perhaps additional medical treatment could have made it less painful for him to go through all those motions. What about as to WellPath itself? To WellPath's liability as an entity? I'm sorry, Your Honor. Thank you. So I think that, so we're not pressing any claims against WellPath as an entity for the Eighth Amendment and for the rehabilitation and ADA claims. I don't think there's one stated in the complaint as is. As I said, Mr. Montanez could try to amend in, on remand, a 504 claim with evidence of WellPath's federal funding. The district court understood there to be a claim and concluded that, well, there might otherwise be with a policy or custom? Yes, yes, absolutely. And those allegations are not in the necessarily truncated complaint. But again, if Mr. Montanez has allegations of that, he should be able to amend them. There seems to be nothing about that, even the opposition papers that would suggest a policy or custom. Yes, Your Honor, I think that's true. And I think that, you know, we're seeking from this court both remand on these three specific legal issues, or I'm sorry, reversal on these three specific legal issues. So that's the lack of program or service being named and deliberate indifference in both the disability context and the Eighth Amendment context. But the district judge wrote a 27-page opinion, and we actually only take umbrage with about eight pages of it. And so the findings as, or sorry, the holdings as to WellPath, we think we're correct on the complaint. And if Mr. Montanez is given a chance to amend it, he has that information, he shouldn't be precluded from including that in an amended complaint. It's not in the record. So the district court wouldn't have been completely out of order to find that that would be futile. I'm sorry, I shouldn't have said out of order. It wouldn't have been completely wrong to have found that that would have been futile. But with respect to a lot of the allegations against individual defendants, certainly it wouldn't have been futile. Against whom do you believe you have your claims? In the Eighth Amendment context, the strongest claims as alleged in the complaint are against Nurse Swagman and Dr. Mollie. And I point out that also in the district court's opinion, and this is... And where does Mr. Ehlers fit in this for divulging information? Yes. So Mr. Ehlers, Mr. Montanez alleges that he lied about the results of an x-ray, and this was taken after he fell. And so I think that there's a question there. And this is, again, one of these defendants that admittedly there's little in the actual complaint other than this allegation of him lying. But as a non-medical provider, of course, medical providers, if they're aware of... Non-medical providers, if they're aware of care by medical providers, aren't normally individually liable under the Eighth Amendment. But if he interfered in that care, if he had knowledge that Mr. Montanez, in fact, did have a herniated disc and instead told him that his results were normal and precluded further care, then that would state an Eighth Amendment claim. So that's also something that the district court could consider on amendment. I have gone well over my time, so I'm happy to return on rebuttal unless there's any other questions that the court has. Is it your intention to... Will you be representing Mr. Montanez on remand? So we've been retained just for the limited scope of the appeal. That's a conversation our office would have to have. But if we're not able to do it, we'll certainly do what we can to try to find him pro bono representation. Good morning, Your Honors. Or, I don't know, maybe afternoon. My name is Atrani Seabrooks, and I'm here on behalf of the medical appellees, Wellpath, Dr. Preston, Dr. Molley, Dr. Edwards, and PA Nolley. Okay, my understanding based on plaintiff's, excuse me, appellant's argument here today is that they are just raising the appeal as to the grant of dismissal of the Eighth Amendment claims in favor of medical appellees. And so unless the court has questions regarding the ADA... The question on the Eighth Amendment is, can you tell us why leaving someone paralyzed, incontinent, in extreme pain for three days is within professional standards of medical care? I believe that based on the allegations set forth in Mr. Montanez's complaint was that the initial nurse who saw him believed that he was faking his condition. It turns out he wasn't faking, and it turns out he had stenosis and edema, and he had surgery. So somebody thought, whoa, we better move quickly. It is correct that it was ultimately determined that he did have a medical diagnosis. However, when he was seen by Dr. Molley the day after he had seen the initial nurse, his allegations just simply state that he reported that he was unable to walk. I know that in the complaint he alleges that he crawled across the desk, but then in his brief in opposition to the motion to dismiss, he states that he simply informed the doctor that he was unable to walk. Ms. Seabrooks, does WellPath get federal funding? No. Okay. And your friend on the other side said that Montanez's position is WellPath doctors are engaged in state action under Section 1983. What's your position on that and why? I would agree that WellPath's doctors are engaged in state action simply because WellPath is contracted to provide medical services within the DOC. Okay. And therefore, their providers providing those services are working to provide a to provide the medical services which the state is required to provide. I just want to clarify your answer. When you say WellPath doesn't receive federal funds, you're saying that they don't have any federal loans, no federal grants, no federal contracts. As far as I'm aware, based on the information provided on my clients, they do not receive federal funding. So even looking to materials that we could take judicial notice of, like government websites, would suggest otherwise. I do not know, Your Honor, and I would have to look into that. But as far as I know, as of today, my client has informed us that they do not receive federal funds. Did you do any research after you got the court's letter asking about this? I did not do research on that specific issue because the question had come up some time ago within the two or three years, and I was informed by my client that they did not receive federal funds. Are you relying on something that they told you years ago? You're making a current representation based on the information that's currently available to you. I am relying on something that I was told years ago. You did not do any further inquiry in response to this court's letter asking you to. I did not inquire of my client as to whether or not they received federal funds. But in discussing this matter with my supervising attorney, he also advised that WellPath does not directly receive federal funds at all. And we are unaware of WellPath receiving any indirect federal funds. Maybe if you could just check again and then submit a letter to update. Grants, loans, contracts. Right. I will do that. Okay. I'm returning to the initial question. Based on Mr. Montanez's allegations, it appears that he may have been left paralyzed, so to say, in his cell for three days. However, there are no additional allegations which suggest that. He hasn't set anything forth in his complaint or even briefed in opposition, even though we don't look to the facts or the allegations set forth in the brief. He doesn't set forth any additional allegations which would support that his claim in this regard. He does allege in the complaint that Dr. Mali left him alone in the cell for three days, knowing that he was paralyzed and that he was uncontrollably urinating on himself. Well, how is that not deliberate indifference? Providers within the prison see inmates based on their requests for treatment. And so if Mr. Montanez was experiencing these symptoms or paralysis, using incontinence, essentially, then we would expect that he would place a sick call to be seen. And if something had happened where it was observed that he actually was experiencing these things, then that would prompt additional treatment based on his allegations alone. But the case law is not just when there's a specific request. It's also when there's a need that is open and obvious, right? That is true, Your Honor. But, not but, I do agree with that statement. And noting that he that Dr. Mali examined him, I would presume that Dr. Mali observed that he was not paralyzed and not urinating on himself, or he didn't see evidence of that. We have to take what's in the complaint, and the complaint alleges that he knew these two conditions. Well, the complaint alleges that he told Dr. Mali this, not that Dr. Mali actually observed him crawling across the desk or observed him either urinating on himself or seeing that he used the bathroom in his cell. Or, yeah, the complaint doesn't set forth additional allegations to support these allegations. It just says that, hey, I told this doctor this, and because I told him this, he should have believed me and done something more. Upon examination, it appears that nothing further was determined, which would prompt Dr. Mali to send Mr. Montanez to the hospital or provide additional treatment. What is the examination that you're referring to? Well, in his complaint, he alleges that Dr. Mali examined him through a cell door, and I understand that he took issue with the fact that Dr. Mali did not enter the cell, which, based on how treatment is provided within the prison, examinations are typically done through a cell door unless the inmate is brought to the medical department. If an inmate is dragging himself across the floor and reporting to the doctor that he's paralyzed and urinating uncontrollably on himself, I come back to how is that not deliberate indifference to leave that inmate in the cell for three days? I think when looking at the fact that Mr. Montanez was thought to be faking it the day prior, that lends to the assumption that he may have had a reputation of faking it. And then upon examination, Dr. Mali, there's no allegations which state that Dr. Mali specifically observed him crawling or dragging himself across the floor. There are no allegations that Dr. Mali observed urination in the cell. And so I don't, I understand what the court is saying, but I could also see Dr. Mali's judgment in this circumstance where he's waiting to see if what Mr. Montanez is reporting is actually true. But isn't that something a jury really needs to decide? I'm sorry, Your Honor. Isn't that something a jury really needs to decide? Based on, I would agree that that particular allegation may support a claim for a deliberate indifference. And so if Mr. Montanez were to admit his complaint in this regard and set forth additional facts, then possibly this is something that we would want to consider and look at the evidence to see if there is actually grounds for a jury decision. We know you can do that because we've got in the record the opposition after the motion to dismiss, right? While that doesn't function as an amendment, is there any reason we can't consider that as a sort of proffer of what a basis might be to amend? The court can consider anything that it wishes. I think that in this case, and we've made the argument in our brief that an amendment here would be futile because he's already amended twice. None of his allegations actually support claims of deliberate indifference. And just with respect to the Eighth Amendment claim, if he were to amend, I think that he would need more facts or more allegations to actually support an Eighth Amendment deliberate indifference claim against Dr. Motley specifically. More than nurses and doctors refusing to help him get to the toilet, more than having to pull himself up on the dirty toilet to access the sink. More than the doctors watching him as he crawls across the floor soaked in urine. I did not read in his complaint. I don't believe that it's alleged in his complaint that any of our providers observed him crawling across the floor or dragging himself to use the restroom. And so it would... We can look to the opposition to the motion to dismiss. As facts that could be alleged if there were an amendment. So how, in light of what's there, can you say that amendment would be futile? Well, I agreed that amendment may be helpful with respect to his Eighth Amendment claim as to Dr. Motley. I do not believe that based on his allegations, he set forth claims as to any of the other medical providers. And with respect to his actual complaint, the allegations in his original amended and original and amended complaints and even the allegations in his brief in support, I don't believe that he has set forth... Well, I don't... Excuse me. He is not alleged that our providers observed him engaging in these acts which would have prompted additional medical treatment. Pages on a form that was provided to him for pro se litigants. So it's not surprising, is it, that there's limited allegations in the span of three and a half pages? Well, his actual amended complaint, I don't know the exact pagination, but I know that it was well over 20 pages. And within that amended complaint, his specific allegations, and I believe that's on page it may be... I can pull my... If you don't mind, I can grab my brief. But the first page after the three pages towards the bottom, it specifically states that he saw Dr. Motley the next day. And that Dr. Motley came through his cell door, he examined him through the cell door, and he told him he was not able to walk. And he crawled across the desk. And then he also states that he informed Dr. Motley that he was joining himself and Dr. Motley nodded and walked off. In his brief in opposition, he specifically just states that Dr. Motley came to his cell door and he simply told him that he was unable to walk. And then at some point, he told Dr. Motley that he was also urinating on himself and that Dr. Motley walked off. There are no allegations that I'm aware of that any of our providers actually observed him crawling across the floor or actually using the bathroom on himself or that anyone in particular reported these things with the exception of maybe the first nurse. And based on his complaint, we don't know exactly what was reported to Dr. Motley. The amended complaint in the section on request for relief describes seeing Dr. Motley through the cell bars as he didn't come into the cell to examine me. I couldn't walk, so I dragged myself across the cell desk. I made Dr. Motley aware that I was urinating on myself, to which he nodded and walked off. He did nothing to help me from urinating on myself. This continued for a total of three days. Yes. And then when you review his brief in opposition, he states that he was not able to walk. I believe that that may be on page 47. He specifically states he told Dr. Motley that he was unable to walk and he also reported that he was urinating on himself. With the exception of that one allegation, there's no allegations which state that any of our providers, and especially Dr. Preston, P.A. Notley, Dr. Edwards, actually observed him urinating on himself or crawling across the and that's likely due to the fact that their treatment was limited to after his surgery. But with respect to Dr. Motley, his complaint is completely void of allegations which suggests that Dr. Motley was aware that, well, learned that this was true. We don't, essentially, we don't know how they got to the point of seeing him on August 28th and sending him to the doctors on August 31st. And that's why I conceded earlier that it's possible that he may be able to re-allege an Eighth Amendment claim as to Dr. Motley, but I don't believe that he has one as to the other medical appellees. Ms. Seabrooks, we will put out an order as well, but I encourage you to gather the information that you can as to your clients, whether your client receives federal funding in any regard, and to return that information to us in your capacity as an officer of the court. Yes, Your Honor. Do you have any additional questions? Thank you. May it please the court, Jacob Frasch, representing the Commonwealth Defendants, and I'm asking the court to affirm the District Court's dismissal of all claims with prejudice. I'll start with the Eighth Amendment claims, which I believe are now only operative against my clients, Wagman and Ehlers. If I could just start with prejudice, because as to leave to amend, that's not something that you've engaged in your brief. Do you concede that, or I gather not, if you're arguing that it should be dismissed with prejudice, how would amendment be futile as to the various claims, the 1983 claims, the ADA and RA claims, given what's in the opposition to the motion to dismiss? There are 47 additional pages. Well, yeah, I can go claim by claim, and I'll start with the claims against Nurse Wagman, and why I think that dismissal with prejudice was appropriate, actually, in light of the brief in opposition that he filed below. You brought us to our attention that the case Pearson, which obviously involves allegations that are very parallel, very similar to the allegations here. However, Pearson establishes on page 536 two distinct sub-prongs of a deliberate indifference medical treatment claim. The first is adequacy of the medical care, which I'm not going to stand up here and say that Nurse Male acted appropriately in that regard. But the second is the individual defendant's state of mind, which is a subjective inquiry. And if we look to plaintiff's brief below, you will see that he concedes Nurse Melanie thought he was faking it. That is a concession that came from plaintiff. It's not my concession. That respectfully shows exactly why amendment of that claim against Nurse Male is futile. And you compare those... That sounds like an issue the jury ought to decide. Is he faking it, or is he not faking it? Well, the question is, does she believe... Subjectively think he was faking it. And the question is, has he plausibly alleged that she believes that there's a serious medical need that she's not treating? And that's his obligation, not mine. But at the point that she does an examination, and then he's requesting to go to the hospital, she refuses to do that and allegedly laughs at the notion and instead returns him to a  Again, the laughing was not kind. I'm not going to defend that. But Pearson also establishes that nurses, like Nurse Male or Nurse Wagman, can rely on the medical decisions made by their supervising doctors. And that's precisely what she did here. She took him to the cell, examined him, took his vitals, called up Dr. Molly. Molly said, back in the cell. Now, there's no allegation here that she lied to Dr. Molly or misrepresented his condition. She did precisely what I would assume this court would expect her to do, make a medical decision, escalate that medical decision to the doctor in charge. Medical decision to have him crawl across the floor? So that I'm not defending as a medical decision. That I'm defending on the grounds that he has pled himself out of court, basically, with his allegation that she thought he was faking it. Again, if this allegation, this is in you've made the argument that what's in the opposition shouldn't be viewed as an amendment to the complaint. So we're not we're not looking at that for amendment purposes, right? So I understand the cross contamination issue here, if you will. If you go back to the amended, if you go back to the amended complaint, the operative complaint, this dragging across the floor allegation does not appear. Drag a by body across the cell. I don't know what that means, right? The drag the body across the floor allegation appears in the briefs in opposition. So if we're going to look at those briefs to determine whether amendments should be futile, you can't look at only that and ignore the next line that says nurse Mel thought he was faking it. And these allegations, by the way, are in stark contrast to Pearson, where the inmate was screaming in pain for hours. The inmate had been seen by two other nurses. The inmate was about to be seen by a doctor the next day. A guard had gone to the nurse and said, we got this inmate. I believe he went to Nurse Rhodes twice in Pearson and said, you got to examine this inmate. He's in a really bad state. And the court even says in Pearson, quote, Nurse Rhodes knew that he could not walk. And again, respectfully, it is our position that Mr. Montan is the plaintiff here, pled himself out of court with this allegation about faking it. I'll move on to the claim. This was a pro se complaint, right? It was a pro se complaint. And he's alleged a number of things that are concerning. And you're saying he has pled himself out of court with respect to, let's say, just Nurse Wagman and Dr. Malley. Those look like, based on the complaint so far, that these are well beyond anything reasonable in terms of medical care standards, correct? I would agree that we cannot defend her decision on the basis of making a medical decision. That Pearson completely eliminates our ability to do that. The question is, as Pearson established, there's two prongs. There's the objective prong, whether the care met the standard. And there's the subjective prong, whether did the defendant actually think that the care was necessary? Did the defendant actually believe? And this knowledge prong is not new to Pearson. It's raised in Young as well. At most, that gets you the first time when it's thought like, oh, he's faking it. But then when he persists in urinating on himself and it's three days, et cetera, we don't have to carry that faking it forward to everything. Agreed. However, there's no further allegations against Nurse Malley. The allegations are she took him to the cell, basically jumped him in the cell, as the allegations stand. You mean Dr. Malley? Which nurse are you talking about? Sorry. The defendant, Nurse Wagman, sometimes is referred to as Nurse Malley in the pleadings, sometimes as Nurse Wagman. OK. All right. I don't represent Dr. Malley. So I'm only focused on Nurse Malley or Nurse Wagman. Malley is Wagman. Got it. Yes. So again, you are probably right that if there were further allegations, she had come back the next day and he's lying in a pool of his own urine and she still says, oh, you're faking, do we pass the plausibility line? Probably at that point. OK. Well, we have a bunch of defendants here. We have a bunch of things. We have this one statement in the opposition. How do we know that none of this could be amended? It may be ultimately that the district judge decides, OK, as to this person with this first interaction, that. But if the district court is getting so many of these things wrong, doesn't it suggest we just send the whole thing back, let them try to amend and then let the district court sort it out? Well, it sounds like the approach you're taking is there were a lot of things missed the first time. So just do a total redo the second time. It does seem like you can't defend a number of these decisions. Your friend on your side can't defend a number of these decisions. Well, I can't defend Nurse Malley's decision to make him crawl, but I can defend the decision that found she was not liable under the 8th Amendment. As to the first interaction, right? And then there are a whole bunch of other actors who have interactions with him after that point. Right. OK? Well, and again, 1983 is individual liability. So we do this all the time in prisoner litigation, right? We go, OK, defendant number one out of 27. And that's what I would ask the court to do here. I know the case is complicated and it's complicated facts. And I would ask that the court go defendant by defendant through the facts. Can I just ask what you're referring to in this alleged pleading out of the case? Is it the statement that Defendant Wagman said during this time? Oh, God, stop faking it. Yes, that's I think on page 90. So his allegation that she said that aloud is what precludes him from amending his complaint? Well, deliberate indifference in this, the actions she took. And why not also as to that statement? You can't challenge someone who says, oh, God, stop faking it. Well, it's his burden to prove, to plead, plausibly allege the existence of the second prong, which is the knowledge. No reasonable jury could find that that wasn't evidence of deliberate indifference. It was likely deliberate indifference, perhaps to his dignity, shall we say. But the claim is deliberate indifference to his medical needs. Mr. Montanez has no insight subjectively into what she actually believes. And there's no assertion as to what she actually believes. There's an assertion as to what she said, which may contrast with what a jury would find that she actually believed, right? I agree. It is still his burden to plausibly allege it in the first place. And the case, Young, that you cited specifically says that these prison defendants, officials, are not required to just believe anything that the inmate says. It says they have to do some sort of investigation. This is a pro se complaint. We read it liberally. And you draw inferences in the face of a motion to dismiss in favor of the non-movement. And what we have here are specific allegations that could reasonably be viewed as providing information to Nurse Wagman, providing a basis for her to actually understand that he was paralyzed and couldn't move. And that's alleged to be her response to it. Couldn't a... Respectfully, the only actual allegation... That demonstrates deliberate indifference. Respectfully, the only factual allegation that he includes anywhere is that he said he couldn't walk, right? No, he says that she left him in the cell and he had to crawl across the floor. Well, he tells her he cannot walk and then he crawls across the floor. So the question then becomes, does every inmate who says to a corrections officer or a nurse, I can't walk and does something, you know, does something to suggest that they cannot walk and the inmate, sorry, the corrections officer or the nurse has no other reason to believe them. Does that state a claim? Again, the... The corrections officer doesn't come back with, you know, I saw you walking 15 minutes ago. She comes back with this exact, what could be read as angry or exasperated or something else. Oh God, stop faking it. You know, that's an allegation that makes a difference. Again, I would argue that it makes a difference in our favor. Again, to contrast the allegations in Pearson, he's not screaming in pain. He hasn't been seen by two other nurses. There's no guard calling him saying, hey, this guy's getting worse. You better see him. This knowledge element is not unique to Pearson. It has been raised, again, in other cases, in the Young case, in the Beers Capital case that we cite. We're talking here about a motion to dismiss. You take the allegations as they are made. That's correct. He still has to plausibly allege the second prong of the deliberate indifference. And he's pro se. So in other words, you're saying is just whatever the rigid standard is for the best counsel applies to this person pro se, and you wouldn't even give him a chance to amend. Well, I would argue that would not be correct except for two facts. First, he has essentially already had three opportunities to state his claim, the original complaint, amended complaint, and these briefs below. Second, the allegations that he has chosen to include in his briefs below, this idea that she thought he was faking it, in our position, pleads him right out of court. It is our position that it doesn't create the plausible. You're meeting a lot of opposition on that. I understand that, Your Honor. I will briefly address the ADA claims if I can. I know I'm out of time, but I know the court is interested in that. So first, this new theory of ADA liability about the denial of access to sinks, to toilets, to meals, this was not raised below. And I don't even think plaintiffs will argue that it was raised below. The theory of the ADA liability below was very clearly and very explicitly, I did not get good medical care. So it is our position that we would argue that he cannot raise these new claims now. We would also argue that the court should not consider the possible existence of these new claims when determining whether the district court abused its discretion, because the district court's not required to look through the pro se inmate's plaintiff's papers as like an issue spotter exam, right? Like what possible ADA claims could exist here? They're just not required to do that. And so if the court decides to vacate and remand, I would ask the court not to simply say plaintiff has stated an ADA claim under this new theory, but instead to say plaintiff should be permitted to state this new theory. And that's for a few reasons. There's a few defenses that are available, we believe, against these new theories that we did not have the opportunity to raise below. Was Mr. Montanez actually disabled at the time of this initial incident, right? We know that the definition of disabled under the ADA and the regulations is not uncomplicated, shall we say. It does not always include individuals who are suffering from a temporary illness. And we would want to be able to raise that defense below. We would also want to raise the defense below of was anyone in a position, any of my clients at least, in a position to know that the ADA was substantially likely to be violated on this new theory. The issue before us is just whether he's stated a claim, right? It's just whether he's stated a claim. And if he has, then it moves forward. You can address other defenses that you may see fit. But the question before us is simply whether there's enough here to plausibly allege violations of the ADA and Rehabilitation Act and Eighth Amendment. I almost agree with that. I think there's a secondary question, which there's, has he plausibly alleged an ADA claim in his original complaint? I mean, his amended complaint, the operative pleading. And the secondary question is, should he, based on the additional allegations in the briefs, be permitted to file another amended complaint below and be given the opportunity to state an ADA claim? And that's the position, if this court is going to remand, our position would be it should take that second question and answer it that way. He should be permitted to attempt to state an ADA claim below. And the court should not hold that these allegations in the brief do state a claim because they're not in an operative pleading. I would also like to briefly touch on the derivative liability. Same thing. This was not raised in the briefs here. It was very, it was touched upon in Mr. Montana's, is, I believe it is in the brief in opposition. It is only in the brief in opposition to the medical defendants. Therefore, again, if this court is going to vacate and remand or reverse and remand, we would argue that the court not touch on this derivative liability issue for several reasons. So arguably, I agree that the language of those regulations does create some sort of derivative liability. However, the language of those provisions is complex. Took me a long time to read that one. And we don't know which provision he would be going under. We don't know, has it been established that plaintiffs have a right to bring a claim under these regulations? Do the regulations broaden the scope of liability under the ADA? If they do, are they valid? Are they a valid abrogation of the state's 11th immunity? I note the Armstrong case you pointed us to relied heavily on Chevron when determining that the regulations were valid. Obviously, we know Chevron is no longer good law. Oh, and I already mentioned the 11th Amendment issue. So again, if the court vacates and remand, we would ask that it deal with this derivative liability issue by simply letting the district court and the parties in the district court sort it out by themselves. Are there any further questions? All right, I thank you so much. I have a couple of questions for you. Do you agree if we were to determine that the medical defendants violated that their conduct demonstrated deliberate indifference under the ADA or Rehabilitation Act, that that would be imputed to the Commonwealth? No. Again, the regulations on their face suggest some form of derivative liability for the Commonwealth. That has not been expressly raised here. And there are lots of issues with raising it here for the first time without even the benefit of briefing. Again, on the face, the regulations do suggest that there is some sort of derivative liability. But we would ask that the court not pass on that specific issue and let the district court sort it out in the first instance for all those reasons I just explained. You agree that under the 1983 claims that the medical defendants in their individual capacities are state actors and that that would be attributed to their conduct is attributable to the Commonwealth? I'm sorry, did you say under 1983? Yes. 1983 creates personal liability for those state actors. And if they are state actors, then they are personally liability. It's not our act. Just like the state can't be liable in a party under a 1983 claim, except in certain circumstances. You agree that they are qualifying as state actors? Yes. I mean, I think the Supreme Court decision, the name escapes me now, I think that firmly establishes that. And I don't see why the Third Circuit decision you referenced changes that analysis. Thank you so much. Thank you. Thank you, Your Honors. So I just have four quick responses to the medical defendants and four additional to the Commonwealth defendants. One of them overlaps on this issue of the allegation that Nurse Lackmann said that he was faking it in the response brief. The court can look to Spruill, which was also at the pleading stage, where the plaintiff in that case included in his pleadings allegations that the doctors thought he was playing games, said that they didn't believe that he was really in pain. Yet looking at all of the allegations and viewing them in the light most favorable to him, found that he had sufficiently alleged deliberate indifference. For the question of, I'm so sorry, exactly, sorry, so for Dr. Mali, for his deliberate indifference. It's not our position, as my friend on the other side represented, that he would need to amend to show deliberate indifference for Dr. Mali. We think the allegations in the amended complaint are sufficient. And the allegations in the complaint, as this court read, do show that Dr. Mali witnessed him drag himself across the desk and witnessed him hearing that he was urinating on himself. And again, nothing further occurred on that. And so we have to take those allegations as they are and not assume that any further medical help was put in place. On the question of Wellcraft contracts, there is, on federal government websites, evidence of contracts that this court can take judicial notice of. And then, Judge Krauss, you had a question about for additional, why can't we look at his additional allegations as a proffer to amend? That's exactly what this court should do. And that's what the district court's decision in Gordon lays out that for pro se litigants, that's particularly appropriate. So then quickly, the Commonwealth's point. So as to amendment, the Commonwealth stated that Mr. Montanus had three chances to state his claim. He's only had one. He amended once, but that was to add Nurse Wagman's last name and make some minor changes. And the case from this court, Phillips, that the district court relies on, that was a case where the defendant appealed, got to amend. And then on his second chance after remand for two of those defendants, he didn't do enough. That's many steps ahead of where we're at this case. And then finally, just on the ADA point that the Commonwealth made, pro se litigants plead facts. They don't plead legal theories. And so Mr. Montanus has pled sufficient facts to state the claims about access to service to those services that he alleged. And then finally, to the point about whether or not he was actually had a disability, Congress made clear in the 2008 amendments to the ADA that that's not the core inquiry. He was a person with an impairment, and that impacted standing and walking to daily activities. Mr. Thrash argued with some force that the whole derivative liability issue that depends on some regulations is complex. And we've got the issue of Armstrong and Director Chevron. All of that should be left to remand, whether we impute this to the Commonwealth, et cetera. Do you have any reason to disagree? So I think it could be appropriate to remand it if this court wanted to reach it. Armstrong relies on Chevron. Henrietta Dee, the Second Circuit decision that this court pointed us to is just a straight statutory interpretation decision that looks to principles of contract law when looking into Spending Act litigation because of the fact that the Rehabilitation Act's remedy was adopted in Title II. We think that that reasoning is extremely persuasive, and this court could reach those legal questions. But we'd also be more than happy to provide supplemental briefing. Thank you. Thank you so much. We thank counsel for their patience through the long morning and early afternoon of argument. It's a very interesting argument. We also would like to have a transcript of this argument, and we'll have the government take up that cost.